## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

**ANTHONY PAUL JOHN,**

      **Petitioner,**

**vs.**                                      **Case No. 4:11cv359-WS/CAS**

**MICHAEL D. CREWS, Secretary,**
**Florida Department of Corrections,[1]**

      **Respondent.**

_____/

## REPORT AND RECOMMENDATION TO DENY § 2254 PETITION

On July 25, 2011, Petitioner Anthony Paul John, proceeding pro se, filed a

petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Doc. 1.  On December

9, 2011, Petitioner filed an amended § 2254 petition.  Doc. 10.  Respondent filed an

answer, with exhibits, on June 19, 2012.  Docs. 20, 21.  Petitioner filed a reply on July

20, 2012.  Doc. 22.  On June 20, 2014, Petitioner also filed a motion requesting this

Court hold his § 2254 petition in abeyance.  Doc. 26.

---

[1]The Clerk of Court shall substitute Michael D. Crews as Secretary of the Florida
Department of Corrections in place of Kenneth S. Tucker.  Michael D. Crews became
Secretary on December 17, 2012, and shall be automatically substituted pursuant to
Federal Rule of Civil Procedure 25(d).

The matter was referred to the undersigned United States Magistrate Judge for report and recommendation pursuant to 28 U.S.C. § 636 and Northern District of Florida Local Rule 72.2(B).  After careful consideration of all issues raised, the undersigned has determined that no evidentiary hearing is required for disposition of this matter.  *See* Rule 8(a), R. Gov. § 2254 Cases in U.S. Dist. Cts.  For the reasons stated herein, the pleadings and attachments before the Court show that Petitioner is not entitled to federal habeas relief, and the § 2254 petition should be denied.  Petitioner's motion requesting the Court hold his petition in abeyance should also be denied.

## State Court Proceedings

By information filed in the Second Judicial Circuit, Leon County, in case number 05-CF-03322, the State of Florida charged Petitioner Anthony John and a co-defendant with one count of armed robbery with a firearm (victim Thomas Green, a Jimmy John's delivery driver), a first degree felony punishable by life, in violation of section 775.087 and 812.12(2)(a), Florida Statutes, and one count of armed robbery with a deadly weapon (victim Joseph Biggs, a Papa John's delivery driver), in violation of section 812.13(2)(a), Florida Statutes, in connection with events that took place on September 10 and 11, 2005.  Doc. 21 Ex. B at 1-2.  John proceeded to trial in August 2006, during which he and several other witnesses testified; the jury found him guilty of robbery on the first charge and theft on the second charge.  *Id.* at 71-72 (verdict); *Id.* Ex. E (trial transcript).  On February 19, 2007, the state trial court sentenced John to fifteen (15) years in prison on the first count, as a Prison Releasee Reoffender, and sixty (60) days on the second count.  Doc. 21 Ex. B at 87-97.

John appealed his judgment and sentence to the First District Court of Appeal (DCA), assigned case number 1D07-1090.  *See* Doc. 21 Ex. K.  John's appellate attorney filed an <u>Anders</u> brief.[2]  *Id.* Ex. K.  The First DCA granted John leave to file a pro se initial brief.  *Id.* Ex. L.  John filed a pro se appellate brief and raised five points.  *Id.* Ex. M.  The First DCA affirmed the case per curiam without an opinion on November 26, 2008.  *Id.* Ex. N; *see* <u>John v. State</u>, 995 So. 2d 957 (Fla. 1st DCA 2008) (table).  The mandate issued December 23, 2008.  Doc. 21 Ex. O.

On March 29, 2009, John filed a motion for post-conviction relief pursuant to Florida Rule of Criminal Procedure 3.850, with attachments, asserting fifteen claims, most of which alleged ineffective assistance of counsel (IAC).  Doc. 21 Ex. P at 1-44.  The state post-conviction court directed the Office of the State Attorney to file a response.  *Id.* at 45.  The State filed a response on June 18, 2009.  *Id.* at 47-55.  John filed a reply to the State's response.  *Id.* at 58-65.  In an interlocutory order rendered December 11, 2009, the state post-conviction court summarily denied ten of John's claims and set the remaining five claims (Grounds 2, 4, 6, 8, and 9) for an evidentiary hearing.  *Id.* at 66-79.  The court appointed counsel to represent John.  *Id.* at 79.

The evidentiary hearing took place on March 22, 2010, and John was represented by counsel.  Doc. 21 Ex. Q (hearing transcript).  At the conclusion of the hearing, the judge found John had not met his burden on either prong of the IAC test set forth in <u>Strickland v. Washington</u>, and the Rule 3.850 motion would be denied in a

---

[2]<u>Anders v. California</u>, 386 U.S. 738 (1967).

forthcoming written order.  *Id.* at 31-32.  In an order rendered March 26, 2010, the state

post-conviction trial court denied the Rule 3.850 motion.  Doc. 21 Ex. P at 198-203.

John appealed, pro se, to the First DCA, and filed an initial brief raising seven

points in case number 1D10-2910.  Doc. 21 Ex. R.  The State filed an Answer Brief.  *Id.*

Ex. S.  John filed a Reply Brief.  *Id.* Ex. T.  The First DCA issued a per curiam

affirmance without an opinion on February 10, 2011.  *Id.* Ex. U; *see* <u>John v. State</u>, 54

So. 3d 493 (Fla. 1st DCA 2011).  The mandate issued March 8, 2011.  Doc. 21 Ex. V.

While his Rule 3.850 motion was pending, John also filed two petitions in the

First DCA alleging IAC regarding his appellate attorney, assigned case numbers 1D09-

2989 and 1D10-4816.  Doc. 21 Exs. W, Y.  The First DCA denied both petitions on the

merits.  *Id.* Exs. X, Z; *see* <u>John v. State</u>, 18 So. 3d 1140 (Fla. 1st DCA 2009).

As indicated above, on July 25, 2011, John filed a timely § 2254 petition in this

Court.  Doc. 1.  John subsequently filed an amended § 2254 petition, raising nine

grounds:

> (1)  IAC for misapplying and misstating critical facts of evidence.  Doc. 10
> at 6.

> (2)  IAC for failing to file a motion to suppress or motion in limine
> concerning unrelated, prejudicial videotape evidence.  *Id.*

> (3) IAC for failing to object to the admission of evidence concerning
> unrelated criminal conduct not charged by the State, specifically the
> videotaped interrogation concerning the robbery.  *Id.* at 7.

> (4) IAC for not advising John of his right to sever the charges.  *Id.*

> (5) IAC for not objecting to the prosecutor's closing statements and
> argument, when the prosecutor told the jury that the videotaped

interrogation was proof that John committed the robbery involving Joseph Biggs.  *Id.* at 8.

(6) IAC for failing to request a special jury instruction on "independent act," where John did not participate in the crimes.  *Id.*

(7) The state trial court erred in denying the discharge of counsel based on counsel's ineffective assistance.  *Id.* at 9.

(8) Fundamental error occurred when the prosecutor misstated the facts and law in the closing argument.  *Id.* at 10.

(9) The cumulative effect of the errors rises to prejudicial plain error and warrants habeas relief.  *Id.* at 12.

Respondent has filed a response, Doc. 20, with exhibits, Doc. 21.  John has filed a

reply.  Doc. 22.

## Analysis

Pursuant to 28 U.S.C. § 2254, as amended by the Anti-Terrorism and Effective

Death Penalty Act of 1996 (AEDPA), federal courts may grant habeas corpus relief for

persons in state custody.  Section 2254(d) provides, in pertinent part:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  *See* Williams v. Taylor, 529 U.S. 362 (2000); Gill v. Mecusker,

633 F.3d 1272 (11th Cir. 2011).

If a state prisoner's habeas petition "includes a claim that has been 'adjudicated on the merits in State court proceedings,' § 2254(d), an additional restriction applies." Cullen v. Pinholster, 131 S.Ct. 1388, 1398 (2011).  The federal court may not grant relief unless the state court's adjudication of the claim:  (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.  28 U.S.C. § 2254(d).   "This is a 'difficult to meet' and 'highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt.'"  Cullen, 131 S.Ct. at 1398 (quoting Harrington v. Richter, 131 S.Ct. 770, 786 (2011), and Woodford v. Visciotti, 537 U.S. 19, 24 (2002)).  This Court's review "is limited to the record that was before the state court that adjudicated the claim on the merits."  Cullen, 131 S.Ct. at 1388.

For claims of ineffective assistance of counsel (IAC), the U.S. Supreme Court adopted a two-part test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.  Second, the defendant must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

Strickland, 466 U.S. at 687.  To demonstrate ineffectiveness, a "defendant must show that counsel's performance fell below an objective standard of reasonableness."  *Id.* at

688.  To demonstrate prejudice, a defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id.* at 694.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id.*  For this Court's purposes, importantly, "[t]he question 'is not whether a federal court believes the state court's determination' under the Strickland standard 'was incorrect but whether that determination was unreasonable – a substantially higher threshold.'"  Knowles v. Mirzayance, 556 U.S. 111, 123 (2009) (quoting Schiro v. Landrigan, 550 U.S. 465, 473 (2007)).  "And, because the Strickland standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard."  *Id.*  It is a "doubly deferential judicial review that applies to a Strickland claim evaluated under the § 2254(d)(1) standard."  *Id.*

The first three grounds John raises in his § 2254 petition allege IAC based on the same set of facts.  Accordingly, as did Respondent and John (in his Reply), this Court will address these grounds together.  *See* Doc. 17 at 6-7, Doc. 20 at 24-29, Doc. 22 at 6-13.

### Ground 1: IAC – Misapplying and Misstating Critical Facts

### Ground 2: IAC – Failure to File Motion to Suppress

### Ground 3: IAC – Failure to Object to State's Admission of Evidence

In these grounds, John asserts his trial attorney rendered ineffective assistance by not filing a motion to suppress evidence concerning another robbery committed only by his co-defendant and his attorney also misstated the evidence to the jury.  *See* Doc.

10 at 6-7.  As Respondent indicates, John raised the same or similar arguments as the

second and fourth grounds in his Rule 3.850 motion.  *See* Doc. 21 Ex. P at 6-7, 8-9.

The state trial court denied the claims after an evidentiary hearing, making the following

findings:

## GROUND 2

Many of defendant's assertions throughout his motion are based on his belief that part of the defendant's videotaped interview pertained to a crime for which he was not on trial.  Although the co-defendant (Demetrice Waller) was charged with four armed robberies that occurred over a two day period, the defendant was only charged with two of these four robberies.  In the videotape, the investigator questioned defendant about two robberies, and Defendant provided information as to both.  Defendant contends that only one of the incidents discussed on videotape (the Jimmy John's sandwich robbery) was an incident giving rise to charges against him.  Defendant further contends that he was not charged with the "pizza robbery" that was discussed on the videotape.  In the instant case, defendant was charged with and tried for 1) the September 11, 2005, Jimmy John's sandwich robbery (victim Thomas Green) and 2) the September 10, 2005, robbery of a Papa John's pizza delivery person (victim Joseph Biggs).  According to defendant, the Papa John's robbery was not the pizza robbery discussed on the videotape.  Instead, defendant alleges that the pizza robbery discussed on the videotape was a September 11, 2005, robbery of a Hungry Howie's pizza delivery person (victim Gerald Loiacono), one of the other robberies Waller was charged with, but the defendant was not.

In Ground Two, defendant claims that counsel provided ineffective assistance by failing to file a motion in limine or motion to suppress the portion of his videotaped interview in which he discusses the pizza robbery.  Throughout his motion, defendant maintains that this alleged evidence of an uncharged crime (the Hungry Howie's robbery) caused the jury to find him guilty of robbery and petit theft for the Jimmy John's and Papa John's incidents, respectively.

At trial, the defendant was represented by Elizabeth Peskin.  At the March 22, 2010 hearing, Ms. Peskin testified she was admitted to the Georgia Bar in 2002 and the Florida Bar in 2004.  At the time of the trial in the instant case, she had tried 20-30 felony jury trials and handled 100s of

felony cases.  At the evidentiary hearing, trial counsel testified that her trial strategy was to point the finger at the co-defendant who was charged with two additional robberies and carried the weapon involved in all four robberies.  Ms. Peskin believed evidence of the two additional robberies, where only the co-defendant were charged, were helpful to this strategy. Therefore, she determined that it would not be advantageous to suppress information about the other two robberies.  Ms. Peskin testified that she spoke to Mr. John numerous times about the above issues.  It is also clear from her opening statement at trial that she had watched the videotaped interview and understood that the robberies were discussed in the video in reverse chronological order.  *Exhibit 1, July 17, 2006 Jury Trial Transcript, p. 17.*

Additionally, the State informed the jury in its opening statement at trial that they may hear testimony about another robbery, but that the defendant was not charged in that robbery.  The State makes it clear several times during opening statement that the Defendant is only charged with the Jimmy John's and Papa Johns robberies.  *Exhibit 1, p. 11-12 and 14-15.*

In order for defendant to prevail on an ineffective assistance of counsel claim, he must demonstrate that: (1) counsel's performance was so deficient that it fell below an objective standard of reasonableness; and (2) counsel's deficient performance prejudiced the defense, depriving defendant of a fair trial.  Strickland v. Washington, 466 U.S. 668, 687 (1984).  To establish prejudice, defendant must show there is a reasonable probability that, but for counsel's unprofessional error, the result of the proceeding would have been different.  *Id.* at 687.

Defense counsel's strategic choices generally do not constitute deficient conduct.  Henry v. State, 948 So. 2d 609 (Fla. 2006).  The Court finds that trial counsel's strategy was reasonable and her representation did not fall below an objective standard of reasonableness.  Additionally, the Court finds defendant failed to show there is a reasonable probability that a motion in limine or motion to suppress the portion of his videotaped interview in which he discusses the pizza robbery would have been granted or if granted, that the result of the proceeding would have been different.  Notably, Defendant was charged with Armed Robbery with a Deadly Weapon for the Papa John's incident, but the jury returned a much more favorable verdict of petit theft.  Therefore, Ground 2 is denied.

**GROUND 4**

> In Ground Four, defendant claims that he received ineffective
> assistance of counsel because counsel did not object to admission of
> evidence concerning "unrelated criminal conduct not charged to
> defendant."  Specifically, Defendant claims counsel should have objected
> to portions of the videotape in which he allegedly discussed his
> participation in the uncharged Hungry Howie's robbery.  For the reasons
> set forth in Ground 2, this claim is also denied.

Doc. 21 Ex. P at 199-201.  These rulings, affirmed on appeal without opinion, are

entitled to AEDPA deference and review is limited to the record before the state court.

*See* 28 U.S.C. § 2254(d); Cullen, 131 S. Ct. at 1402; Richter, 131 S. Ct. at 784-85;

Wright v. Sec'y of Dep't of Corr., 278 F.3d 1245, 1255 (11th Cir. 2002).  As explained

below, the record supports the state court findings.

Specifically, at the state post-conviction evidentiary hearing, John's trial counsel,

Elizabeth Peskin, testified.  Doc. 21 Ex. Q at 3-21.  Ms. Peskin testified she was

admitted to practice in Georgia in 2002 and in Florida in 2004.  Id. at 7.  She was

appointed as conflict counsel, to represent John, and proceeded to trial in August 2006.

*Id.* at 3, 7.  Prior to that, she had "probably done 20 or 30 or so jury trials in the felony

division" and handled hundreds of other types of criminal cases.  *Id.* at 7.  She

remembered there was a videotape in the case but was "a bit hazy" regarding the

contents.  *Id.* at 3.  She testified on direct concerning the discussion of other crimes in

the videotaped interrogations:

> Q . . . Now, there was also in the interrogations some obvious talk of other
> crimes, other than the one Mr. John was charged with.  Why were those
> not redacted?
>
> A I believe it was made fairly clear in the videotape that he was not
> charged with those crimes.

Q But you recall those crimes being mentioned – spoken of?

A Perhaps, you should enlighten me on what crimes you're talking about specifically.

Q I mean there's – the videotape talks about robberies in the area and the, specifically, about a Hungry Howie robbery.

A I – I don't recall.  I mean, I –

Q So it's your testimony you just didn't redact any of this or didn't ask for it to be redacted?

A No, I mean I certainly did not move to redact it.  That's –

Q Okay. . . Did you ever file a motion in limine or a motion to sever these cases?

A I don't believe so.

Q Why was that?

A As I recall, there was an issue with the – well, let me put it this way.  There was a codefendant in the case that was involved, I believe, in a number of the incidents.  And, as my recollection, the strategy would have been to blame it all on that codefendant.  Therefore, it wouldn't have hurt [John's] case to have those crimes also discussed.

Q Okay.  Did you speak to Mr. John about this?

A I spoke to Mr. John numerous times about all of these issues.

*Id.* at 5-6.  On cross-examination by John's counsel, Ms. Peskin testified her

relationship with John was "not good" and described the basis for her assessment:

> Mr. John was charged as a prison releasee reoffender with a crime that carried life if he were convicted.  Ms. Cappleman [the prosecutor] had offered, I believe, ten years.  I had urged him to take that offer and, I believe, up until quite close to trial he had made several complaints to the Judge about me.

> We had a Nelson hearing.  I believe there was a Faretta hearing as
> well.  But, ultimately, he declined to represent himself.  So I would like to
> say that prior to trial we were able to work out some of our differences.
> But I don't believe he ever cared for me much.

*Id.* at 8.  Peskin testified that she believed the allegations concerning the motion to

suppress were the subject of the <u>Nelson</u> hearing, and explained that John had filed a

pro se motion when she was representing him and she did not adopt that motion.  *Id.* at

8-9.  She testified that the court held the <u>Nelson</u> hearing and found there was no basis

for finding she was ineffective for failing to file a motion to suppress.  *Id.* at 9.

Concerning the reference to the co-defendant's robberies in John's case, Peskin

testified that including them was part of her strategy and the strategy worked better than

she had anticipated:

> Q . . . Mr. John was charged with some of the robberies but Mr. Waller
> was charged with all of the robberies, is that correct?
>
> A That is how I remember it, yes.
>
> Q Okay.  And was Mr. Waller also the one alleged to have done – to have
> the greater role in the robberies?
>
> A Yes, I believe he was also the one with the weapon, if I'm not mistaken.
>
> Q And the State was going on a principle theory as to Mr. John, is that
> correct?
>
> A Yes.
>
> Q Now, why would – given that scenario, why would you think that it would
> be helpful to Mr. John to have the other robberies of which he was not
> associated with in which the State never alleged that he was guilty of to be
> brought up in this case?

A I think it's helpful if you can associate the codefendant with being guilty as to the other robberies, it certainly helps alleviate some of the burden from Mr. John in the case of the robberies he was charged with.

Q And he was charged as a principle to armed robbery, is that correct?

A Yes.

Q And do you recall what the verdict was?

A Was guilty of lesser included robbery.

Q On one and then it was also guilty of –

A I believe it was a petit theft, a misdemeanor.

Q On the other?

A Yes.

Q So your strategy seemed to produce some results, is that correct?

A Far better than I anticipated, quite honestly.

*Id.* at 11-12.  Ms. Peskin further testified that, by using the video, John was able to present his position without having to testify and she did not see any legally sufficient basis to seek to suppress the video statement:

Q And part of it was – using the video to be played, was the defendant able to explain himself or at least get his story across in the video?

A Yes, absolutely, which would have alleviated the need for him to testify if he had chosen not to.

Q And you had indicated Mr. John had previously been convicted and been in prison, is that correct?

A Yes.

> Q So, by virtue of being able to use his video statement to the police, did that also not allow the jury to learn the number of felony convictions the defendant had?
>
> A Yes.
>
> Q Now, did you have any reason – any basis for filing a motion to suppress the videotaped confession?
>
> A No.  No.  There was no legal basis.
>
> Q Did it appear to you that he had probably been given Miranda and waived it?
>
> A Yes.
>
> Q Did Mr. John ever tell you – give you any specific allegations or facts upon which you believed that you could, in good faith, have filed a motion to suppress the video statement?
>
> A No.  I know that he asked me several times and we discussed it numerous times.  But, no, there was never anything that I felt was legally sufficient.

*Id.* at 12-13.  Ms. Peskin further testified, on redirect:

> Q I just want to go back over and make sure.  So what was the reason you didn't object to the uncharged criminal activity in the videotape again when – in closing argument or when the State spoke to the jury about the videotape?
>
> A Because it went along with the theme of the defense that – which was that it was Mr. Waller's – he was the – the person who came up with the plan and who was the ultimate criminal and the culpable person.

*Id.* at 16-17.  On re-cross, as to the prosecutor's statements about the other crimes, Ms.

Peskin testified:

> Q Now, Ms. Cappleman [the prosecutor] made it clear that they may hear some testimony about some other – another robbery that Mr. Waller was involved in, but that Mr. John was not charged in that case.  He didn't make the call.  They didn't make the – didn't arrange that robbery.  Mr.

Waller acted on his own when he walked over and approached that pizza guy.  And went on to say, so you just did two robberies – I've told you about Jimmy John's and Papa John's.

A Yes.

Q Is that correct?  So it was clear that those other robberies involved Mr. Waller and they, in no way, were related to Mr. John –

A Yes.

Q – is that correct?  Now, but you knew that going in and that was part of your trial strategy, to point everything at Mr. Waller as being the one who's committing the robberies.  And that, at best, Mr. John only may have benefitted by getting a sandwich at least from the Jimmy John's robbery, is that correct?

A Yes, absolutely.

*Id.* at 20-21.

The record thus supports the state post-conviction trial court's findings that, contrary to John's assertions, defense trial counsel did not provide ineffective assistance regarding any misstatement of critical facts, filing of a motion to suppress, or objecting to evidence concerning the co-defendant's crimes.  As John's trial counsel testimony at the evidentiary hearing indicates, all these actions were consistent with her strategy of allowing the jury to associate the codefendant with being guilty as to the other robberies, to alleviate some of the burden from John concerning the charges against him – point to the codefendant as the "the ultimate criminal and culpable person."  Doc. 21 Ex. Q at 17.  As she further testified, the strategy appears successful as the jury convicted John of only petit theft when he was charged with armed robbery with a deadly weapon concerning the Papa John's robbery.  *See* Doc. 21 Ex. A at 72

(verdict).  As the court found, defense counsel's strategic choices generally do not constitute deficient performance.  *See* Henry v. State, 948 So. 2d 609 (Fla. 2006); *see also, e.g.*, Waters v. Thomas, 46 F.3d 1506, 1518-19 (11th Cir. 1995) (en banc) ("We cannot, and will not, second guess such [strategic] decisions" that "trial counsel are called upon to make."); Dingle v. Sec'y for Dep't of Corr., 480 F.3d 1092, 1099 ("[C]onsidering all the circumstances, we give great deference to choices dictated by reasonable strategy.")

Based on the foregoing, John has not shown the state courts' rulings rejecting these claims resulted in a decision that was either (1) contrary to, or involved an unreasonable application of, clearly established U.S. Supreme Court precedent, or (2) based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  *See* 28 U.S.C. § 2254(d)(1)-(2).  John is not entitled to federal habeas relief, and these grounds should be denied.

### Ground 4: IAC – Failure to Advise Petitioner of Right to Sever Charges

In this ground, John argues his trial attorney rendered ineffective assistance by failing to advise him of his right to sever the charges.  Doc. 10 at 7.  Respondent asserts John has not properly exhausted this ground because he "now presents this claim as a failure to advise and complains that his post conviction lawyer treated it only as a[n] ineffective counsel claim for not filing a motion to sever" and indicates, in one sense, John is correct because post-conviction counsel did litigate this claim as one concerning the failure to file a motion to sever, not a claim concerning the failure to advise.  Doc. 20 at 13.  Respondent then asserts the claim concerning the failure to advise, if raised in

the Rule 3.850 motion, was abandoned at the evidentiary hearing, and, further,

Petitioner himself abandoned the claim by failing to raise it in the appeal from the denial

of his Rule 3.850 motion.  *Id.* at 13-14.

John raised this claim in Ground 8 of his Rule 3.850 motion filed in state court.

*See* Doc. 21 Ex. P at 11-12.  The state post-conviction trial court denied the claim after

an evidentiary hearing, making the following findings:

> In Ground Eight, defendant claims that counsel was ineffective for failing to advise defendant of "his right to severance" of the two charges. Had defendant known about the possibility of severance, he claims, he would have chosen to sever the charges.  Trial counsel testified at the evidentiary hearing that she made a strategic decision not to move to sever the charges for two reasons.  First, it would give the State a second opportunity to convict the defendant.  Second, she believed the facts were intertwined and there was no prejudice to the defendant and therefore had no good faith basis to move for severance.  The Court finds that trial counsel's strategic decision was reasonable.  Accordingly, Ground 8 is also denied.

*Id.* at 202.

Concerning the claim that trial counsel rendered ineffective assistance because

of the failure to advise Petitioner of the right to sever charges and the failure to file a

motion to sever, the record supports the state post-conviction trial court's findings that

this constituted a strategic decision.  "Granting or denying a requested severance is

within the trial court's discretion."  State v. Vazquez, 419 So. 2d 1088, 1090 (Fla. 1982).

At the evidentiary hearing, John's trial counsel testified:

> Q Now, you filed a – well, you did not file a motion to sever in this case, is that correct?
>
> A Correct.

Q And was that by –

A Conscious decision?

Q Yes.

A Yes.

Q And why was it by conscious decision?

A Well, there's several reasons.  First of all, I think it makes more sense, if possible, to have one trial on two issues – is you have a jury that can choose – there's a fifty-fifty shot either way.  If you have two juries on two separate issues, then there's – there's a second chance for Mr. John to be convicted.

Second, I think that the facts in this case were intertwined to the point where it made sense to hear it all at once.  I don't think Mr. John was prejudiced in any way by hearing the facts simply because we could use Mr. Waller, who was ultimately the more culpable person in this case, as the scapegoat.

Doc. 21 Ex. Q at 13-14.  John testified at the hearing that he never asked counsel to sever the cases.  *Id.* at 22.

The record thus supports the state post-conviction court's findings, affirmed on appeal, that the decision not to seek severance of the charges constituted a reasonable trial strategy.  *See, e.g.*, Pardo v. Sec'y, Fla. Dep't of Corr., 587 F.3d 1093, 1103-04 (11th Cir. 2009) (explaining district court correctly denied ground alleging IAC for withdrawing motion to sever where record supported state court's factual finding that severance decision was strategic).  John has not shown the state courts' ruling resulted in a decision that was either (1) contrary to, or involved an unreasonable application of, clearly established U.S. Supreme Court precedent, or (2) based on an unreasonable determination of the facts in light of the evidence presented in the state court

proceeding.  *See* 28 U.S.C. § 2254(d)(1)-(2); *see, e.g.*, Waters , 46 F.3d at 1518-19;

Dingle, 480 F.3d at 1099.  This ground should be denied.

### Ground 5: IAC – Failure to Object to Prosecutor's Closing Argument

In this ground, John argues trial counsel rendered ineffective assistance for not

objecting to the portion of the prosecutor's closing argument "that the videotape

interrogation was proof that Petitioner committed the robbery against Papa John's pizza

delivery person, Joseph Biggs."  Doc. 10 at 8.  Respondent argues Petitioner has not

shown the state court ruling rejecting this claim was contrary to or an unreasonable

application of U.S. Supreme Court precedent, nor has Petitioner shown deficient

performance or prejudice as required under Strickland.  Doc. 20 at 35-38.

John raised this claim in Ground 6 of his Rule 3.850 motion filed in state court.

*See* Doc. 21 Ex. P at 10.  The state post-conviction trial court denied the claim after an

evidentiary hearing, making the following findings:

> In Ground Six, Defendant claims that counsel provided ineffective
> assistance by failing to object to the State's closing argument, in which the
> State told the jury that defendant admitted in the videotape that he was
> aware of the Papa John's robbery.  As in Grounds 2 and 4, Defendant
> asserts that his reference on the videotape to a pizza robbery pertained to
> the uncharged Hungry Howie's robbery.  For the reasons set forth in
> Ground 2, this claim is also denied.

Doc. 21 Ex. P at 201.  These rulings, affirmed on appeal without opinion, are entitled to

AEDPA deference and review is limited to the record before the state court.  *See*

Cullen, 131 S. Ct. at 1402; Richter, 131 S. Ct. at 784-85.  For the reasons given in the

analysis of Grounds 1, 2, and 3, *supra*, the record also supports the state post-

conviction trial court's determination that defense counsel did not render ineffective

assistance by failing to object during the prosecutor's closing argument, as this was part of defense counsel's strategy of pointing the finger at John's co-defendant.  John has not shown the state courts' ruling resulted in a decision that was either (1) contrary to, or involved an unreasonable application of, clearly established U.S. Supreme Court precedent, or (2) based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  *See* 28 U.S.C. § 2254(d)(1)-(2).  This ground should be denied.

**Ground 6: IAC – Failure to Request Special Jury Instruction on "Independent Act"**

In this ground, John asserts his trial counsel rendered ineffective assistance by failing to request a special jury instruction on "independent act."  Doc. 10 at 8.  John indicates the basis for this claim is that he did not participate in the crimes.  *Id.*  He explains that he and his co-defendant "agreed to a plan of action where the two of them would telephone a fast-food restaurant, place an order for delivery, [a]nd when the delivery person arrived at fraudulent address, [his co-defendant] would then 'con' the employee out of the food and, hopefully some money."  *Id.* at 8, 23.  John states this was his "understanding and, as such, he lacked 'intent' to commit the crime of robbery."  *Id.* at 23.  John asserts that the robbery of Thomas Green was the independent act of his co-defendant and Mr. Green testified at trial that John was not present anywhere when the co-defendant robbed him.  *Id.*

Respondent asserts John has not met his burden to show deficient performance under Strickland.  Doc. 20 at 39.  Respondent explains that an independent act instruction is appropriate in only limited circumstances, not present in this case, and

further explains, with no citations to the record, according to testimony of witnesses and

John, John knew what his co-defendant intended to do and John participated in

securing the presence of the delivery people, eating the stolen food, and using the

drugs obtained with the proceeds from the robberies.  *Id.* at 39-40; *see, e.g.*, Johnson v.

State, 36 So. 3d 170, 171 (Fla. 3d DCA 2010).   Respondent thus argues that even if

defense counsel had requested the instruction, such request would have been denied,

and John cannot show the likelihood of a different result.  Doc. 20 at 41-42.

John raised this as Ground 9 in his Rule 3.850 motion.  *See* Doc. 21 Ex. P at 12-

13.  In denying the claim, the state post-conviction trial court made the following

findings:

> In Ground Nine, defendant claims that he received ineffective
> assistance of counsel because counsel did not seek a special jury
> instruction on "Independent Act," presumably section 3.6(1), Florida
> Standard Jury Instructions in Criminal Cases.  Ms. Peskin testified that
> she was uncertain whether she had requested the Independent Act
> instruction, but the instruction was not given to the jury.  *Exhibit 1, p. 165.*
> However, Ms. Peskin effectively argued to the jury that defendant did not
> have a conscious intent that any criminal act be done.  *Id. at pg. 222, 233.*
> The Court finds that no evidence was presented that the result of the
> proceeding would have been different, therefore ground 9 is denied.

> In conclusion, it is relevant to note that at the end of the trial,
> defendant stated on the record that he was satisfied with Ms. Peskin's
> representation.  *Id. at pg. 253.*  Defendant affirmed that his attorney
> covered all of the issues, did not forget to do anything, and did not forget
> to call any witnesses.  *Id.*  Finally, defendant stated that his attorney "did a
> good job."  *Id.*

*Id.* at 202.  These rulings, affirmed on appeal without opinion, are entitled to AEDPA

deference and review is limited to the record before the state court.  *See* Cullen, 131 S.

Ct. at 1402; Richter, 131 S. Ct. at 784-85.  The record supports the state court's rulings.

*See* Doc. 21 Exs. E at 219-24, 233-36 (trial transcript reflecting Ms. Peskin's argument

to jury), 253 (trial transcript reflecting John's statement that defense counsel did a good

job); Q at 6 (Ms. Peskin's testimony at evidentiary hearing).

Under Florida law, an independent act instruction is appropriate if sufficient

evidence indicates a person other than the defendant commits or attempts to commit a

crime (1) that the defendant did not intend to occur, (2) in which the defendant did not

participate, and (3) occurred "outside of and was not a reasonably foreseeable

consequence of the common design or unlawful act contemplated by the defendant."

Calabrese v. State, 886 So.2d 396, 398 (Fla. 1st DCA 2004) (quoting court's instruction

to jury).  "Under these limited circumstances, a defendant whose cofelon exceeds the

scope of the original plan is exonerated from any punishment imposed as a result of the

independent act."  Ray v. State, 755 So. 2d 604, 609 (Fla. 2000).  An "independent act"

instruction is not appropriate if the defendant was a willing participant and set in motion

the forces resulting in the charged offense.  *Id.*

A review of the trial transcript reflects an independent act instruction was not

appropriate.  Specifically, Joe Biggs, the victim/delivery person in the Papa John's

charge, testified that on September 10, 2005, two men flagged him down as he was

trying to find an address (which appeared to be for an abandoned house) for a delivery,

they stated they had ordered the pizza, the co-defendant "was doing the talking," and

John was sitting on the curb, about six to ten feet away.  Doc. 21 Ex. E at 20-22.  The

co-defendant took the pizza, handed it John, and walked back over to Mr. Biggs, pulled

out "a knife of sorts," and demanded "give me your money. " *Id.* at 22-23.  Biggs

complied, handing over approximately $79.  *Id.* at 24.  Biggs testified:

> Q And did he have any further instructions after he took your money and your pizza?
>
> A He told me to get in my car and not to call the police.  I do remember that, don't call the police.
>
> Q Let me ask you, when the pizza was handed off to the man sitting on the curb [John], did the man on the curb express any surprise or –
>
> A No.
>
> Q All right.  At any point during this robbery, did the man sitting on the curb with the pizza express any kind of surprise or dismay at what was going on.
>
> A None that I saw.
>
> Q Did he ever get up and run away?
>
> A No.
>
> Q Did he ever hand the pizza back to you and say I am sorry, I didn't know we were going to do this?
>
> A No.
> . . . .
>
> Q Did you ever hear the man sitting on the curb say anything?
>
> A I don't recall hearing him say anything.

*Id.* at 24-25.  On cross, Biggs reiterated there were two men, he was addressed only by

the co-defendant, he was threatened only by the co-defendant, and the co-defendant

was the one that took the pizza (and handed it to John), pulled the knife, and took the

money from Biggs.  *Id.* at 27-28.  On re-direct, Biggs confirmed that during the robbery,

"the man that was sitting on the curb with the pizza, was . . . sitting there the whole time throughout the robbery."  *Id.* at 31.

Thomas Green, the victim/delivery person in the Jimmy John's charge, also testified at trial.  Doc. 21 Ex. E at 32.  Mr. Green testified that on September 11, 2005, he pulled up in front of a house on Highland Street that was "pitch black, dark, looked like nobody was there" and he through he had the wrong address, "[a]nd then a guy [the co-defendant] walked out of the yard . . . he came to my passenger's window."  *Id.* at 33.  Green did not see anyone else with him, but testified that he is "sure there could have been" someone else back in the area from where the co-defendant had approached.  *Id.* at 34. The co-defendant asked if Green was from Jimmy John's and then asked Green to wait while he got something from the house.  *Id.*  The co-defendant left for a minute or two and then approached Green's driver side window.  *Id.* at 35.  The co-defendant asked Green if he had change for a $50 bill; Green testified that he had actually taken the call-in order and the man who had called had requested that he have change for a $50 bill.  *Id.*  Green testified that he normally would not have that much change and had to ask a manager to get it out of the cash register.  *Id.*  Green testified the co-defendant checked the order and then asked for change for the $50 bill; Green did not actually see the $50 bill.  *Id.* at 36.  Green handed him two $20s and a $10.  *Id.*  Green testified that order total was "like $15 or . . . $18."  *Id.* at 37.  Green testified the co-defendant then said "you are good to go, and he started walking off."  *Id.*  Green got out of his car and said "you never gave me the $50 bill," at which point the co-defendant turned around and said, "why are you going to make me walk back like this" and

"proceeded to start to pull out, you know, started pulling out the gun." *Id.*  The co-defendant told Green to leave; Green testified he was frightened when the man had pulled out the gun.  *Id.* at 38.  On cross, Green confirmed that he did not see or hear anyone else.  *Id.* at 41.

Ms. Debora Turner testified that John is a friend of hers and he came to her house on September 11, 2005, to use the phone "to call the pizza man."  *Id.* at 44-45. She testified that when the pizza place called back to confirm the order, she told them not to bring a pizza.  *Id.* at 46.  About an hour later, John came back to her house to use the phone again and he had a man (the co-defendant) with him.  *Id.* at 46-47.  She testified:

> Q All right.  When he came back, he was with Mr. Waller.  Did Mr. Waller come up stairs to your apartment?
>
> A No.
>
> Q Where did Mr. Waller stay?
>
> A Downstairs, right up under my apartment downstairs.
>
> Q And does your apartment let out onto an open hallway?
>
> A Yes.
>
> Q So were you able to see Mr. Waller when he was downstairs?
>
> A Yes.
>
> Q All right.  And Mr. John came upstairs.  What did he tell you?
>
> A He ordered a pizza.  And the man downstairs, I assume he had money, maybe he assumed he had money too because he kept talking about bring this and bring that.

Q What was he saying to bring?

A He was telling him, telling Tony [John] what to order.  So I guess he assumed like I did, assumed he had money because he kept saying tell him to bring change for a hundred.

Q All right.  And that was Mr. Waller telling Mr. John –

A Uh-huh.

Q – who was on the phone?

A Yeah.

Q All right.  Now, was it pizza this time or was it sandwiches?

A I think it was sandwiches.

Q All right.  And you say that Mr. John may have assumed that Mr. Waller had money to pay for the sandwiches?

A He might have, yeah.

Q So didn't Mr. John tell you that they planned to steal the sandwiches?

A That was – no.  That was when he came by himself.  Now, you know, but when he came the second time, the guy was downstairs.  He didn't – you know what I'm saying?  He didn't tell me – I thought the guy had money.

Q Okay.  Let me ask you this, what address did Mr. John give the pizza guy or the sandwich guy?

A I don't know.

Q Was it on Highland Street?

A It started with a H, I think.  I don't know.

*Id.* at 49-51.  Ms. Turner further testified to what she told the investigating officer and

what she saw shortly after John and Waller left her apartment together:

Q Do you remember a female officer from the Tallahassee Police Department talking to you?

A Yes, ma'am.

Q Okay.  And do you remember telling her that . . .Mr. John and Mr. Waller told you or Mr. John told you that he and Mr. Waller did not have money to pay for that food and they intended to snatch the sandwiches?

A Yes, ma'am.

Q Is that what happened?

A Yes, ma'am.
. . . .

Q When he came back with Mr. Waller, didn't he tell you that they intended to snatch the food?

A Yes, ma'am.

Q He did?

A Yes, ma'am.

Q Okay.  And isn't that when Mr. John gave the Highland Street address?

A Yes, ma'am.

Q And you said you didn't need to hear that they didn't have money, you knew another way.  How did you know?

A Because I seen the other guy running down the street with a bag in his hand.

Q Let me ask you, after the phone call was placed, the second one, the one where Mr. John and Mr. Waller were there, did they leave together?

A Yes, ma'am.

Q And the next thing you saw – let me ask you this, the next time you saw either one of them was when?

A When the other guy was running down the street, and he pulled off his shirt.

Q And that was Mr. Waller?

A Yeah.

Q How long after the phone call did you see Mr. Waller running through?

A About 10, 15 minutes, 10 minutes, maybe 10.

Q You said he had a white bag in his hand; is that right?

A Yes, ma'am.

*Id.* at 51-54.  She also testified that John may have had the white bag, she could not remember, but "[s]omebody had it."  *Id.* at 55.  She testified she was Tony eating the sandwich.  *Id.* at 57.  On cross, she confirmed that Tony used the phone both times "but the guy [co-defendant] was telling him what to say the second time."  *Id.* at 63.

Officer Laura Martinez, with the Tallahassee Police Department patrol division, testified that the Jimmy John's bag from Mr. Green's delivery was found in Mr. John's apartment.  *Id.* at 76-77.  Martinez also testified that she interviewed Ms. Turner, who stated that John made a phone call from her residence to order sandwiches for delivery to an address on Highland Street, and John told her "they were going to snatch the food because they did not have any money."  *Id.* at 73-74.  Martinez testified that "they" referred to "Tony and his friend."  *Id.* at 74.  Turner told her that, about forty minutes after the call, she saw "Tony's friend" come running through the apartment complex carrying a white bag.  *Id.*  Turner told Officer Martinez where Tony lived and the officer went to Tony's apartment, where she found Tony and another individual, Kevin King,

but not Waller.  *Id.* at 74-75.  Martinez received consent to search Tony's apartment and found the Jimmy John's bag.  *Id.* at 75-77.  Martinez testified "the ticket number [on the bag] matched the information from the robbery."  *Id.* at 77.

Detective Brice Google, with the Leon County Sheriff's Department, testified that he conducted a videotaped interview with John early in the morning on September 12, 2005.  *Id.* at 96-98.  The videotape was introduced into evidence as State's Exhibit 6.  *Id.* at 98-99.  John's videotaped interview was then played in the courtroom with the jury present.  *Id.* at 99-151.  The transcript reflects that Detective Google advised John of his Miranda rights and John signed the form.  *Id.* at 100-01, 151.  Among other things, John told the detective that he did not take anything from anyone and he did not know "what this guy has done" or "if he robbed anybody" but he did "know he came with a lot of coke, crake" and "he brought sandwiches to the house in a bag."  *Id.* at 108; *see id.* at 123-24.  John first told the detective he did not know who called the sandwich place but then he said he was the person that called to order the sandwiches.  *Id.* at 124-25.  John said he called the sandwich place and gave them "an address out on Highland Street somewhere."  *Id.* at 126.  When Detective Google asked John where he was when Waller acquired the sandwiches, John answered he was "[o]ff to the side . . . upon on the property somewhere . . . just watching."  *Id.* at 127.  John made the following statements:

> I saw him – I saw when the truck pulled up.  I saw him talk to the guy, you now.  And I noticed the guy get out of the truck and go behind him and he said, are you following me?  I didn't see the actual transfer.  I didn't see no money change hands.  I didn't see anything.  But I noticed the guy following him.  He said, are you going to follow me?  and then I

> (unintelligible) and got in the truck and left.  I just watched him leave, and
> that was it.  And, you know, like I said I don't know – I didn't see what he
> did or – I don't know what transpired or what he said to him because I
> wasn't that close.  But that's when he handed me the sandwiches.  And
> that's when he had some money to get the dope the first time.

*Id.*  John said he did not know anything about a gun.  *Id.* at 128.

John also testified himself during the trial.  *Id.* at 171-217.  He testified about the

incident with Mr. Biggs, the Papa John's driver.  *Id.* at 180-82.  He testified he was

sitting on the curb, and Waller brought the pizza over and told him to hold it.  *Id.* at 181.

He testified he did not know what Waller was doing, and he did not see a weapon or an

exchange of money.  *Id.* at 182, 205.  Concerning the Jimmy John's delivery driver,

John testified that he made the call but "[i]t was like he [Waller] was supposed to make

the call" and John "wasn't supposed to have anything to do with any of it, except for the

fact that I went with him because I knew the people in my neighborhood."  *Id.* at 186;

*see id.* at 211-12.  When asked if John knew whether Waller had any money, John

testified:

> No, not – you know, I heard some testimony that like with Mr. Biggs.  I was
> never aware of how much money he had gotten from Mr. Biggs.  I was
> never aware – he don't let me know everything.  I don't know, and I really
> don't concern myself a lot with it because I make my own money.

*Id.* at 187.  John further testified, "I think the address he choose indicated he wanted – I

knew he wanted to manipulate this guy or whatever, you know, when we got there.  I

figured he wanted to manipulate them."  *Id.* at 187-88.  John testified he stayed "out of

sight" during Waller's interaction with the Jimmy John's deliveryman, Mr. Green.  *Id.* at

188.  John saw Green get out of the car and confront Waller about the money.  *Id.*  John

testified he knew Waller did not have a weapon, "didn't have a gun especially."  *Id.* at

189.  On cross, John testified concerning the Jimmy John's incident:

Q . . . So there was a plan --

A I can't say that.

Q – to take his money, wasn't there, Mr. John?

A  I mean, there is – I mean, like I say, I called for him and his plan, I guess, what it was is his manipulation or to con someone out of something.  If that's taking the money, whatever he could con somebody out of, that's what he was planning on doing.

Q Is your definition of manipulation taking money from somebody?

A Well, when you say taking money, again manipulation – the guy gave him the money.

Q.  Because he had a gun.

A He asked for it – no.  He did not give it to him because he had a gun. he asked for it, and he gave it to him.  He didn't see the butt of a gun or what he thought was the butt of a gun until after that fact.
. . . .

Q Was there a plan to manipulate him out of the money?

A I guess.

Q All right.  And we call that robbery in this courtroom, don't we?

A I don't know what you call it.

Q Did you eat the food?

A I ate some.

Q Did you smoke the dope that was purchased with the stolen money?

A I had smoked some.

Q So you got a cut, you got a cut of the take from these robberies, didn't you?

A I had got some.

*Id.* 213-25.

Based on the foregoing, an independent act instruction was not appropriate. John was a willing participant and, at least with regard to the Jimmy John's robbery, set in motion the forces resulting in the charged offense. *See* Ray, 755 So. 2d at 609. Notably, for that charge, John was convicted of a lesser offense, robbery, a second degree felony, rather than the charged offense of robbery with a firearm. See Doc. 21 Ex. A at 71. For the Papa John's incident, John was also convicted of a lesser offense, petit theft, a second degree misdemeanor, rather than the charged felony offense of robbery with a deadly weapon. *See id.* at 72, 87.

John has not shown the state courts' ruling resulted in a decision that was either (1) contrary to, or involved an unreasonable application of, clearly established U.S. Supreme Court precedent, or (2) based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *See* 28 U.S.C. § 2254(d)(1)-(2); *see, e.g.*, Waters , 46 F.3d at 1518-19; Dingle, 480 F.3d at 1099. This ground should be denied.

## Ground 7: Trial Court Erred in Denying Discharge of Counsel for Ineffectiveness

In this ground, John asserts the trial court erred in denying the discharge of counsel based on counsel's ineffectiveness. Doc. 10 at 9. John indicates he filed a pre-trial motion to discharge defense counsel and his complaints included counsel's

failure to file a motion to suppress the videotaped interview with Detective Google, failure to depose victim Thomas Green (where counsel would have learned Mr. Green never saw John during the robbery), and failure to depose Detective Google regarding the videotaped interview (where counsel would have learned the interview included discussion of uncharged crimes), as well as counsel's statement to John that "you're f--cked, you're going to get life."  *Id.* at 9, 24.

Respondent asserts this claim, alleging the trial court did not hold an adequate hearing pursuant to Nelson v. State, 274 So. 2d 256 (Fla. 4th DCA 1973), and should have provided John with new trial counsel, should have been raised on direct appeal but it was not, as defense counsel filed an Anders brief and Petitioner did not raise it in his pro se brief.  Doc. 20 at 5, 42.  Accordingly, Respondent asserts this claim is unexhausted and now procedurally barred.  Doc. 20 at 5, 42.  In addition, Respondent asserts this is a state law issue and does not present a cognizable federal claim.  Doc. 20 at 4, 42.

As Respondent indicates, John did not exhaust this claim as one alleging a federal constitutional violation.  John has not alleged or shown cause for the default and actual prejudice, nor has he alleged or shown actual innocence or a fundamental miscarriage of justice.  *See, e.g.*, Smith v. Jones, 256 F.3d 1135, 1138 (11th Cir. 2001) ("If the petitioner has failed to exhaust state remedies that are no longer available, that failure is a procedural default which will bar federal habeas relief, unless either the cause and prejudice or the fundamental miscarriage of justice exception is applicable.").

Moreover, as Respondent also indicates, this ground alleges a claim of state law error, specifically the failure to hold an adequate hearing under Nelson and provide Petitioner with new trial counsel.  "[F]ederal habeas corpus relief does not lie for errors of state law."  Lewis v. Jeffers, 497 U.S. 764, 780 (1990); see Estelle v. McGuire, 502 U.S. 62, 67-68 (1991) (explaining that errors that do not infringe on defendant's constitutional rights provide no basis for federal habeas corpus relief).  "A state's interpretation of its own laws or rules provides no basis for federal habeas corpus relief, since no question of a constitutional nature is involved."  Carrizales v. Wainwright, 699 F.2d 1053, 1055 (11th Cir. 1983); accord, e.g., McCullough v. Singletary, 967 F.2d 530, 535 (11th Cir. 1992).  This ground should be denied. See, e.g., Mundy v. Sec'y, Dep't of Corr., No. 5:11cv71-RH/GRJ, 2014 WL 1254088 at *1, *9 (N.D. Fla. Mar. 26, 2014) (order denying § 2254 petition and adopting magistrate judge's report and recommendation's treatment of petitioner's challenge to state courts' rulings regarding effort to discharge court-appointed attorney: "Petitioner's Nelson claim challenges the application of state law.  It does not raise a federal constitutional claim and therefore is not cognizable in federal habeas review.").

### Ground 8: Fundamental Error – Prosecutor's Closing Argument

In this ground, John asserts fundamental error occurred when the prosecutor prejudicially misstated the facts and law during closing argument.  Doc. 10 at 10.  John explains that, during closing, the prosecutor argued "that what he is calling manipulation is taking money from someone without their permission, which we call robbery."  Id. John explains that this "manipulate[d] the jury into believing the erroneous application of

the law" because, for robbery to occur, the State had to show an additional element, that the use of "force, fear, or intimidation" was inherent in the crime. *Id.* at 26.  John states that he "admitted that the facts underscoring the incident involved the idea that his co-defendant would 'manipulate' the victim and the victim would hand over his money *absent* any force, fear, and/or intimidation." *Id.*  John argues "[t]he line between theft and robbery is then to begin with," the trial judge should not have allowed this line of argument, and his appellate counsel failed to point out the error in the direct appeal. *Id.*

Respondent indicates this claim is one of fundamental error based on appellate counsel's failure to raise a point on direct appeal concerning the prosecutor's comment in closing argument and thus the only possible claim here is one of ineffective assistance of appellate counsel, which John raised in a petition filed in and denied by the First DCA.  Doc. 20 at 42-43.  Respondent asserts John cannot meet his burden to show ineffective assistance.

Indeed, as Respondent explains, the United States Supreme Court has explained that counsel decides which issues to pursue on appeal and has no duty to raise every possible claim.  *See* Jones v. Barnes, 463 U.S. 745, 751-52 (1983); Doc. 20 at 43. Here, because trial counsel did not object to the comment, appellate counsel would have had to raise the issue as one of fundamental error.  Moreover, this one comment did not amount to fundamental error.  The comment was in response to John's testimony and defense counsel's argument in closing that the co-defendant manipulated the victims out of their money and property.  *See* Doc. 21 Ex. E at 224.  As indicated in

the analysis of Ground 6, *supra*, the victims testified to some threat of force being used in the robberies.  In the rest of the closing, the prosecutor reviewed the evidence indicating John knew these were robberies.  *See* Doc. 21 Ex. E at 224-33.  Therefore, no fundamental error occurred, appellate counsel had no support for such an argument, and John cannot show any likelihood of a different result if counsel had made the argument.  This ground should be denied.

### Ground 9: Cumulative Error

In the ninth and final ground, John argues cumulative error.  The Eleventh Circuit has rejected such an argument in a § 2254 proceeding.  *See* Forrest v. Fla. Dep't of Corr., 342 F. App'x 560, 565 (11th Cir. 2009) (explaining that "[t]he Supreme Court has not directly addressed the applicability of the cumulative error doctrine in the context of an ineffective assistance of counsel claim" but "the Supreme Court has held, in the context of an ineffective assistance of counsel claim, that 'there is generally no basis for finding a Sixth Amendment violation unless the accused can show how specific errors of counsel undermined the reliability of the finding of guilt" (quoting United States v. Cronic, 466 U.S. 648, 659 n.26 (1984))).  Moreover, because each of John's individual claims fail, the cumulative error claim likewise fails.

### Motion to Hold § 2254 Petition in Abeyance

On June 20, 2014, Petitioner filed a motion requesting this Court hold his § 2254 petition in abeyance.  Doc. 26.  Petitioner indicates that now, "[a]fter having time to review his postconviction petitions, the evidentiary hearing transcripts and both written orders by the state court, along with all of the applicable law, [he] is convinced the state

court's order is a non-final order, in that, in fails to address every ground and claim raised by him in his petitions."  *Id.* at 2.  Petitioner does not indicate which ground(s) the state court failed to address, although he states he has a pending "Motion to Hear and Rule" in state court "regarding its nonfinal order."  *Id.*

As demonstrated by the above analysis of the § 2254 petition, each of the grounds Petitioner raised in his Rule 3.850 motion that he then raised in his § 2254 petition (Grounds 1 through 6), were addressed and resolved by the state post-conviction trial court after the evidentiary hearing.  Nothing indicates the state post-conviction trial court's ultimate order was non-final, contrary to Petitioner's allegation in his motion.  *See* Doc. 26 at 2; Doc. 21 Ex. P at 198-203 (final order denying Rule 3.850 motion, entered after evidentiary hearing); *see also* Doc. 21 Ex. P at 66-79 (nonfinal order denying all grounds in Rule 3.850 motion except Grounds 2, 4, 6, 8, and 9, and setting those remaining grounds for evidentiary hearing).  Petitioner's motion, Doc. 26, requesting this Court hold the § 2254 petition in abeyance should be denied.

## Conclusion

Based on the foregoing, Petitioner John is not entitled to federal habeas relief. The amended § 2254 petition (Doc. 10) should be denied.  The motion requesting this Court hold the § 2254 petition in abeyance (Doc. 26) should also be denied.

## Certificate of Appealability

Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant," and if a certificate is

issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)."  Rule 11(b) provides that a timely notice of appeal must still be filed, even if the court issues a certificate of appealability.

Petitioner fails to make a substantial showing of the denial of a constitutional right.  28 U.S.C. § 2253(c)(2); Slack v. McDaniel, 529 U.S. 473, 483-84 (2000) (explaining substantial showing) (citation omitted).  Therefore, the Court should deny a certificate of appealability in its final order.

The second sentence of Rule 11(a) provides: "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue." The parties shall make any argument as to whether a certificate should issue by objections to this report and recommendation.

Leave to appeal in forma pauperis should also be denied.  See Fed. R. App. P. 24(a)(3)(A) (providing that before or after notice of appeal is filed, the court may certify appeal is not in good faith or party is not otherwise entitled to appeal in forma pauperis).

## Recommendation

It is therefore respectfully **RECOMMENDED** that the Court **DENY** Petitioner McKinnon's § 2254 petition (Doc. 1).  It is further **RECOMMENDED** that a certificate of appealability be **DENIED** and that leave to appeal in forma pauperis be **DENIED**.  The Court should also **DENY** Petitioner's motion to hold the § 2254 petition in abeyance (Doc. 26).  The Clerk shall substitute Michael D. Crews for Kenneth S. Tucker as Respondent.

**IN CHAMBERS** at Tallahassee, Florida, on July 21, 2014.


S/  Charles A. Stampelos
**CHARLES A. STAMPELOS**
**UNITED STATES MAGISTRATE JUDGE**


### NOTICE TO THE PARTIES

A party may file specific, written objections to the proposed findings and recommendations within fourteen (14) days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.